JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**
Linda Moore

**(b)** County of Residence of First Listed Plaintiff: Montgomery
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Law Offices of Robert T Vance Jr, 123 South Broad Street, 15th Floor, Philadelphia PA 19109 267-887-0172

**DEFENDANTS**
Montgomery County, Pennsylvania

County of Residence of First Listed Defendant: ______
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)* Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
☐ 365 Personal Injury - Product Liability
☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
☐ 440 Other Civil Rights
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 448 Education

**PRISONER PETITIONS**
Habeas Corpus:
☐ 463 Alien Detainee
☐ 510 Motions to Vacate Sentence
☐ 530 General
☐ 535 Death Penalty
Other:
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition
☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Management Relations
☐ 740 Railway Labor Act
☐ 751 Family and Medical Leave Act
☐ 790 Other Labor Litigation
☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
☐ 462 Naturalization Application
☐ 465 Other Immigration Actions

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 835 Patent - Abbreviated New Drug Application
☐ 840 Trademark
☐ 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
☐ 375 False Claims Act
☐ 376 Qui Tam (31 USC 3729(a))
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit (15 USC 1681 or 1692)
☐ 485 Telephone Consumer Protection Act
☐ 490 Cable/Sat TV
☐ 850 Securities/Commodities/ Exchange
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 895 Freedom of Information Act
☐ 896 Arbitration
☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
☐ 950 Constitutionality of State Statutes

**V. ORIGIN** *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from Another District *(specify)* ☐ 6 Multidistrict Litigation - Transfer ☐ 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
$2 USC Sections 1981 and 1983
Brief description of cause:
Employment discrimination - race and retaliation

**VII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P. **DEMAND $** CHECK YES only if demanded in complaint: **JURY DEMAND:** ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** *(See instructions)*: JUDGE None DOCKET NUMBER ______

DATE: August 14, 2026 SIGNATURE OF ATTORNEY OF RECORD: [signature]

**FOR OFFICE USE ONLY**

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______

JS 44 Reverse (Rev. 04/21)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.)**

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

10/2024

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**

Place of Accident, Incident, or Transaction: Norristown, Pennsylvania

***RELATED CASE IF ANY:*** Case Number: N/A Judge: ______________

1. Does this case involve property included in an earlier numbered suit? Yes ☐
2. Does this case involve a transaction or occurrence which was the subject of an earlier numbered suit? Yes ☐
3. Does this case involve the validity or infringement of a patent which was the subject of an earlier numbered suit? Yes ☐
4. Is this case a second or successive habeas corpus petition, social security appeal, or pro se case filed by the same individual? Yes ☐
5. Is this case related to an earlier numbered suit even though none of the above categories apply? If yes, attach an explanation. Yes ☐

I certify that, to the best of my knowledge and belief, the within case ☐ **is** / ☒ **is not** related to any pending or previously terminated action in this court.

**Civil Litigation Categories**

A. ***Federal Question Cases:***

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts)
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Wage and Hour Class Action/Collective Action
☐ 6. Patent
☐ 7. Copyright/Trademark
☒ 8. Employment
☐ 9. Labor-Management Relations
☐ 10. Civil Rights
☐ 11. Habeas Corpus
☐ 12. Securities Cases
☐ 13. Social Security Review Cases
☐ 14. Qui Tam Cases
☐ 15. Cases Seeking Systemic Relief ***see certification below***
☐ 16. All Other Federal Question Cases. *(Please specify)*: ______________

B. ***Diversity Jurisdiction Cases:***

☐ 1. Insurance Contract and Other Contracts
☐ 2. Aiplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6. Other Personal Injury (*Please specify*): ______________
☐ 7. Products Liability
☐ 8. All Other Diversity Cases: *(Please specify)* ______________

I certify that, to the best of my knowledge and belief, that the remedy sought in this case ☐ **does** / ☒ **does not** have implications beyond the parties before the court and ☐ **does** / ☒ **does not** seek to bar or mandate statewide or nationwide enforcement of a state or federal law including a rule, regulation, policy, or order of the executive branch or a state or federal agency, whether by declaratory judgment and/or any form of injunctive relief.

**ARBITRATION CERTIFICATION (CHECK ONLY ONE BOX BELOW)**

I certify that, to the best of my knowledge and belief:

☒ Pursuant to Local Civil Rule 53.2(3), this case is not eligible for arbitration either because (1) it seeks relief other than money damages; (2) the money damages sought are in excess of $150,000 exclusive of interest and costs; (3) it is a social security case, includes a prisoner as a party, or alleges a violation of a right secured by the U.S. Constitution, or (4) jurisdiction is based in whole or in part on 28 U.S.C. § 1343.

☐ None of the restrictions in Local Civil Rule 53.2 apply and this case is eligible for arbitration.

NOTE: A trial de novo will be by jury only if there has been compliance with F.R.C.P. 38.

**United States District Court for the Eastern District of Pennsylvania**

| | | |
|---|---|---|
| Linda Moore | : | |
| | : | |
| vs | : | Civil Action No. |
| | : | **Jury Trial Demanded** |
| Montgomery County, Pennsylvania | : | |

***Complaint***

Plaintiff, Linda Moore, brings a series of claims against Defendant, Montgomery County, Pennsylvania, of which the following is a statement:

***Jurisdiction and Venue***

1. This Court has original jurisdiction to hear this Complaint and adjudicate the claims stated herein under 28 U.S.C. §§ 1331and 1343, this action being brought under 42 U.S.C. § 1983 ("Section 1983"), the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), and the Civil Rights Act of 1991, Pub. L. 102-166, 105 Stat. 1071 (Nov. 21, 1991). The Court has jurisdiction over Ms. Moore-Singleton's state law claim pursuant to 28 U.S.C. § 1367.

2. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to this case occurred in this judicial district.

***The Parties***

3. Plaintiff, Linda Moore, is an African-American female citizen of the United States and a resident of this judicial district.

4. Defendant Montgomery County, Pennsylvania, is a political subdivision of the Commonwealth of Pennsylvania with its principal place of business located in Norristown, Pennsylvania.

5. At all times relevant to this action, defendant was an "employer" within the meaning of Sections 1981 and 1983, and applicable state law.

6. The acts set forth in this Complaint were authorized, ordered, condoned, ratified and/or done by defendant's officers, agents, employees and/or representatives while actively engaged in the management of defendant's business and pursuant to defendant's official policies and customs.

***Background Facts***

7. On February 22, 2021, Moore assumed the position of Administrator, Office of Drug and Alcohol, Department of Health and Human Services, for defendant. At all times relevant to this Complaint, Ms. Moore was an excellent employee.

8. On October 21, 2024, Moore met in the office of Tamra Williams, Deputy Chief Operating Officer, Department of Health and Human Services, to discuss how Williams and Nadine Miller, Administrator, Office of Children and Youth, Interim Deputy Director, Department of Health and Human Services, could support Moore's team, based on Miller's observations following deputy interviews.

9. On October 28, 2024, Moore received a Coaching Action Plan via email [from who?] unexpectedly. (See Exhibit A attached hereto and made a part hereof). Moore was concerned because she hadn't been informed that the discussion on October 21, 2024, would result in a formal write-up.

10. On October 30, 2024, during a Post-Cabinet meeting discussion with Williams, Moore asked why there was no prior warning about the plan. Williams told Moore to ask Miller, which she did. Miller explained she had sent her usual staff coaching plan to Williams, without realizing it would be used formally, and that Williams did not follow-up with her.

11. On November 7, 2024, Moore had an in-person meeting with Miller to discuss the coaching plan. Miller then told Moore to "accept the plan and move forward."

12. On November 11, 2024, a follow-up meeting was cut short due to Moore's concerns. Miller acknowledged to Moore that she would not have handled things like Williams.

13. On November 22, 2024, Moore spoke with Francis Bartusis, defendant's Human Resources Manager, who advised Moore to speak directly with Williams and Miller and shared Moore's concern about being excluded from the write-up process.

14. On November 25, 2024, during an office meeting regarding training next steps, there was discussion of a potential promotion of Matt Phillips to Team Lead, conference attendance for staff, Deputy hiring, and a Grant position approval that was still pending across HHS.

15. On December 4, 2024, final training steps were discussed with trainers. Miller suggested coaching but provided no structure. The trainers requested clarity, but Miller deferred to her.

16. On December 9, 2024, Moore asked Miller to unlock the coaching plan so that Moore could add comments. Miller denied the request.

17. On December 24, 2024, Moore met again with Miller to revisit plan access and to discuss supervision-related staff concerns. Miller said she would speak directly with staff, which undermined Moore's leadership.

18. On January 14, 2025, staff expressed to Moore discomfort about meeting requests, stating that "it doesn't feel good." Moore was also advised that Miller had requested a copy of Moore's paid leave time for 2024, which was a request Miller had never made in the past related to any other staff member.

19. On January 16, 2025, Williams requested a 12 PM Teams check-in for Jan 17, despite Moore's counseling conflict. Moore's rescheduling request was ignored.

20. On January 17, 2025, Bartusis informed Moore that he was meeting with staff at Miller's request. That same day, Moore met with Williams and Miller to discuss team support. Williams suggested involving Nancy Welsh, a staff trainer for defendant, for team-building. In May 2024, Moore previously had requested Welsh, but Williams denied the request.

21. On January 21, 2025, Williams arranged a meeting between Welsh and Miller regarding team-building support.

22. On January 27, 2025, Moore participated in a bi-weekly check-in with Miller and Williams during which creating an organizational chart was discussed. Moore expressed feeling overwhelmed and discussed involving Welsh in team-building.

23. On January 28, 2025, Moore submitted a formal complaint of discrimination and retaliation to Bartusis. (*See* Exhibit B attached hereto and made a part hereof)

24. On January 29, 2025, an interview with Bartusis was scheduled but canceled at the last minute.

25. On January 30, 2025, supervision with Renee Pigeon was canceled due to illness. This circumstance was later misrepresented in Anthony Brew's June 2, 2025 complaint as a missed February 27 meeting.

26. On February 4, 2025, Moore met with Welsh to discuss team-building logistics.

27. On February 11, 2025, Moore submitted to Bartusis an Addendum to her January 28, 2025 complaint of discrimination and retaliation. (*See* Exhibit C attached hereto and made a part hereof).

28. On February 14, 2025, Moore participated in a meeting with Miller and Williams focused solely on team-building – there was no mention of the coaching plan.

29. On February 24, 2025, Moore raised concerns about Charles Clark sharing pictures of Moore's deceased family members on his Facebook page and his morale issues. Moore was directed by Miller to ask him directly about his future plans.

30. On March 5, 2025, during a meeting with Bartusis that had originally been scheduled for January 29, 2025, Bartusis asked about the coaching plan and what coaching Moore had received. Moore confirmed she was having bi-weekly meetings with Miller, but that there was no discussion about the plan. Bartusis asked Moore about removing her from the plan and supporting her team. He also noted that staff concerns began in October 2024. Moore shared concerns about disgruntled staff tied to a grant ending in December 2025, and noted that Pigeon was unaware that her position was grant-funded. They also discussed Moore's key obstacles and need for a Deputy.

31. On March 10, 2025, during a bi-weekly meeting with Miller, Moore asked about next steps for the action plan.

32. On March 18, 2025, Moore emailed Williams, Laura York, Donna Richemond, defendant's Chief Diversity, Equity, and Inclusion Officer, and Miller, expressing that she was overwhelmed. Williams offered Miller's support, but no follow-up occurred, only a reduction in the number of meetings.

33. On March 24, 2025, Moore emailed Welsh about planning the second team-building session and canceled the monthly ODA staff meeting. The cancellation was later cited by Anthony Brew, defendant's Chief Human Resources Officer, as contributing to a hostile work environment.

34. On April 18, 2025, during the bi-weekly meeting, Moore commented that no one followed up after she conveyed her concerns to Human Resources, Williams, or Miller. Moore also expressed fears of retaliation, and met with concerned staff who were afraid to go to Human Resources, and instead asked if they could contact Williams.

35. On April 22, 2025, Moore received an email from Williams and Miller stating "all complaints and grievances have been resolved and no new issues." In response, Moore emailed Brew to note ongoing staff targeting and a lack of follow-up.

36. On June 2, 2025, during a meeting with Miller and Brew, Moore was placed on a progressive coaching plan signed by Miller, although Miller never reviewed it with Moore. Miller and Bartusis confirmed to Moore that the plan was not disciplinary, but Moore was not given an opportunity to dispute it, which created a hostile, toxic environment with threatened staff.

37. On June 5, 2025, Moore requested a new investigation, because the allegations stemmed from year-old staff concerns and Moore was not permitted to substantiate her leadership efforts. Brew replied, "we are leaving these things in the past and taking this as an opportunity to move forward."

38. On June 6, 2025, Moore emailed Brew a complaint regarding the issuance of the Coaching Action Plan and the Performance Improvement Plan, the unwarranted investigations against her, and other instances of racism and conscious bias she was experiencing. (*See* Exhibit D attached hereto and made a part hereof).

39. That same day, Brew emailed Moore back, acknowledging receipt of her complaint, but stating that he was not going to take any action on her complaint and telling

Moore that, "now is the time to look forward, not backward." (*See* Exhibit E attached hereto and made a part hereof).

40. However, on June 9, 2025, during a Meeting with Miller and Megan Brown, defendant's Director of Human Resources Operations, Moore was handed a Performance Improvement Plan, again without the opportunity to provide documentation or dispute its basis, which was based on past staff complaints, rather than any documented performance issues. (*See* Exhibit F attached hereto and made a part hereof).

41. The Coaching Plan and Performance Improvement Plan were issued to Moore without her input and were based on outdated staff complaints, not documented performance issues.

42. After issuing the Coaching Plan to Moore, defendant failed to provide any structure or consistent coaching to Moore, Williams and Miller repeatedly failed to address Moore's concerns, and Human Resources ignored or significantly delayed responding to Moore's request for clarity, support, and feedback.

43. Rather than investigate Moore's legitimate and valid concerns of racism and bias, on July 16, 2025, defendant terminated Moore's employment.

44. There was no legitimate, valid, or supportable basis for terminating Moore's employment. Rather, defendant terminated Moore's employment because of her race and in retaliation for complaining about defendant's race discrimination and bias.

45. Contemporaneous with her termination, defendant offered Moore an unsolicited severance agreement, in which defendant offered to pay Moore $26,248.64 in exchange for her waiving all claims against defendant. (*See* Exhibit G attached hereto and made a part hereof). No policy of defendant required that Moore be offered severance.

46. Defendant's offer of a severance package is evidence of discrimination, retaliation and pretext.

47. Moore has suffered, is now suffering and will continue to suffer emotional distress, mental anguish, loss of enjoyment of life and other non-pecuniary losses as a direct and proximate result of defendant's discrimination and retaliation.

48. By reason of defendant's discrimination and retaliation, Moore suffered extreme harm, including loss of income and other employment benefits, loss of professional opportunities, embarrassment and humiliation.

49. Defendant acted and failed to act willfully, maliciously, intentionally and with reckless disregard for Moore's rights.

***Count I***

*The Civil Rights Act of 1866, 42 U.S.C. §1981*

50. Plaintiff restates and realleges paragraphs 1-49, inclusive, as though set forth here in full.

51. Moore had a federal statutory right under the Civil Rights Act of 1866, 42 U.S.C. §1981 ("Section 1981"), as amended, to be accorded the same rights as were enjoyed by White employees and applicants with respect to the terms and conditions of their employment relationship with defendant and to the enjoyment of all benefits, privileges, terms and conditions of that relationship.

52. Defendant's conduct described above deprived Moore of the rights, privileges and immunities guaranteed to her under Section 1981.

53. By reason of defendant's conduct, Moore is entitled to all legal and equitable relief available under Section 1981.

***Jury Demand***

54. Moore hereby demands a trial by jury as to all issues so triable.

***Prayer for Relief***

Wherefore, Plaintiff, Linda Moore, respectfully prays that the Court:

a. adjudge, decree and declare that defendant has engaged in illegal race discrimination and retaliation, and that the actions and practices of defendant complained of herein are violative of her rights under Section 1981;

b. order defendant to provide appropriate job relief to Moore, including reinstatement;

c. enter judgment in favor of Moore and against defendant for all available remedies and damages under law and equity, including, but not limited to, back pay, front pay, reinstatement, past and future mental anguish and pain and suffering, in amounts to be determined at trial;

d. order defendant to pay the attorney's fees, costs, expenses and expert witness fees of Moore associated with this case;

e. grant such other and further legal and equitable relief as may be found appropriate and as the Court may deem just or equitable; and

f. retain jurisdiction until such time as the Court is satisfied that defendant has remedied the unlawful and illegal practices complained of herein and is determined to be in full compliance with the law.

Robert T Vance Jr
Law Offices of Robert T Vance Jr
123 South Broad Street, 15th Floor
Philadelphia PA 19109
267 887 0172 tel / 215 501 5380 fax
rvance@vancelf.com

*Attorney for Linda Moore*

# Exhibit A

# EMPLOYEE COACHING/ACTION PLAN

**Employee: Lynne Moore-Singleton**

| IDENTIFIED AREA | GOAL | ACTIONS/OBJECTIVES | COMPLETION DATE | REVIEW DATES | OUTCOME |
|---|---|---|---|---|---|
| Employee Supervision | Maintain consistent supervision | • Schedule weekly supervision with direct reports<br>• Hold in-person supervision sessions. If meeting is held virtually, ensure cameras on turned on<br>• Cancelled supervision are to be rescheduled<br>• Provide guidance, direction and documentation to support direct reports' task completion | • Develop schedule by 11/4/24<br>• Other actions Ongoing | 1 Month from effective date; monthly thereafter for 3 months. Plan will be reassessed after 3 months. | Improved oversight of direct reports through regular supervision to ensure completion of required tasks. |
| Increased Visibility | Strengthen ODA operations | • Administrator will complete work days in-office at a minimum three days per week<br>• Administrator will suspend attendance at day long meetings<br>• Administrator will suspend attendance at multi-day conferences | • Effective week of 11/4/24 then Ongoing<br>• Until further notice<br>• Until further notice | 1 Month from effective date; monthly thereafter for 3 months. Plan will be reassessed after 3 months | Effective demonstration of improved ODA operations to meet all stated requirements. |

| | | | | | |
|---|---|---|---|---|---|
| ODA Team | Strengthen ODA team | • Hold bi-weekly team meetings to review progress on assigned projects, plans and timeframes<br>• Administrator to monitor individual team members assigned work to ensure timely completion<br>• Team members and administrator to attend all scheduled grant program meetings<br>• Administrator to lead and model desired team member behavior<br>• Administrator to participate in activities that strengthen teamwork<br>• Administrator's supervisor to periodically observe team meetings.<br>• Pause hiring of ODA Deputy Administrator | • Effective 11/11/ then Ongoing<br>• All other actions Ongoing<br>• Resume hiring Jan 2025 pending progress on action plan | | Improved team collaboration and cohesion led by effective leadership |
| Time off | Clearly communicated scheduled time off | • Provide advance notice of scheduled FMLA related appointments in a form agreed upon by you and your supervisor<br>• Update time off requests as needed to reflect time taken<br>• Minimize frequency of changes to scheduled time off or out of office. | • Ongoing<br>• Ongoing<br>• Ongoing | 1 Month from effective date; monthly thereafter for 3 months. Plan will be reassessed after 3 months | Increased ease in time off accountability |

You have been given the opportunity to review and discuss this Action Plan. It has been explained that the purpose of this plan is to improve and support your performance and that of your team. It was also explained we will work with you to develop ways to meet these responsibilities but it is ultimately your responsibility to demonstrate your ability to do so.

| | | | |
|---|---|---|---|
| Employee Signature/Date | Supervisor Signature/Date | Administrator/Date | Director/Deputy Director/Date |

# Exhibit B

**Linda Moore-Singleton**
241 Wembly Road
Upper Darby, PA 19082
Linda.Moore-Singleton@montgomerycountypa.gov
January 23, 2025

Francis Bartusis
Human Relations Manager
Human Resources
610-278-3052

**Dear Fran,**
Please note that I am hesitant to send this complaint to you but understand I must follow the county grievance process.

I am sending this email as a formal complaint of discrimination and retaliation. I believe I have been discriminated against by my white supervisor and a few female staff members.

**Examples of Discrimination and a Hostile Work Environment/Retaliation:**

1. On November 2, 2024, during a supervision meeting with one of my staff members, she made a verbal complaint about a peer—who is also a direct report—stating that she had concerns regarding the individual's inability to be culturally competent.

2. These concerns were further evidenced during a meeting with a direct report who is a white female. I presented her with a six-month evaluation. The meeting took place via Zoom. During the call, I was told to "shut up," "be quiet," and "stop talking" by the employee. When I attempted to address this behavior, the staff member responded by saying, "I don't feel safe." When I asked for clarification about this statement, the staff member immediately hung up the Zoom call. I attempted to write up the employee, but my supervisor told me I could not do so. I reached out to the HHS HR Director for guidance on what I believed to be an incident of insubordination. The HR Director told me which category on the disciplinary form aligned with the incident, as they were updating the form downtown. When I sent an email back with the examples, my supervisor was CC'd. The HR Director then advised me not to proceed with the disciplinary action, citing that I was working on team building. I believe this was another example of discrimination, as the staff member in question is white, and my supervisor, also a white woman, disagreed with me writing the individual up despite the lack of respect shown to me and my position. This is further evidenced by the fact that the HHS Director, via email, stated I could write the staff member up for a different incident but was not allowed to address the blatant disrespect. When

I wrote the verbal warning for the incident and brought it to my white supervisor to ask who would sign the form, she replied, "I'm not signing that because that's not what Dr. Williams said to do."

3. I mention this incident as an example of discrimination because my supervisor, a white woman, refused to address this incident and instead moved my direct report to another office under the supervision of another administrator who is also a white woman. I believe these behaviors and statements violate both company policy and relevant anti-discrimination laws, including those related to race, gender, and other protected characteristics.

4. I believe the disapproval of the verbal warning by my supervisor that was presented to my direct report in the presence of another white administrator on October 25, 2024, resulted in me receiving a Coaching Action Plan" on October 29, 2024. I believe this plan was given to me by my white supervisor in retaliation for the staff write-up to my direct report who is also a white woman.

5. On December 24, 2025, during my supervision I asked a question about the first area of concern on the Coaching Action Plan- Employee Supervision that has action steps: schedule weekly supervision with direct reports, hold in-person supervision sessions, if virtually, ensure cameras turned on." I shared that I have supervision notes, and calendar invites to provide an update to the section of the plan. My supervisor shared that is not her style and she would prefer to meet with staff. I received a request from one of my staff on January 15, 2025, requesting a meeting with me to express concerns about my supervisor's request to meet stating, "This doesn't feel good, and I don't like what's happening. I believe the actions of my supervisor caused conflict within my team created a hostile work environment and caused a division among staff. Most of my team was hired in 2023 and have not worked directly with me until September due to being overseen by the Deputy. I began supervising the team in August 2024 as part of a transition from their direct supervisor who resigned. During this time, I have attempted to create a positive work environment by having regularly scheduled check-ins changed my in-office day to accommodate the staff to be available if needed. I also brought in breakfast for the staff, treated them to a team building activity at the escape Room facility in King of Prussia, and provided a safe place for them to share their concerns during a "no rules, no agenda" one one-on-one conversation with me. To date, no one has shared their concerns with me about their displeasure with my performance. I was offered the opportunity to provide a Team Building training that was canceled due to rumors and false information shared with my supervisor who did not respect my opinion and chose not to include me in the decision to cancel the training but dictated that I was to cease the training 2days before the event is another example of my supervisor taking my authority away and creating a negative toxic environment.

6. After sharing my concern with a few of my colleagues I was encouraged to speak with HR regarding the concerns with retaliation and receiving the Coaching Action Plan. On November 22, 2024, I scheduled a meeting with the HR relations Manager who agreed to review the document and schedule a follow-up meeting. During this time I also asked that he not speak with my supervisor before providing me a response. He agreed however, during the follow-up meeting on December 3, 2024, we had via Teams he shared that he spoke with my supervisor, and she shared the concerns with the number of people who have left my office. I was concerned that since he identified my supervisor as someone he's worked with for over 20 years and continued to tell me how nice she was and redirected me back to speak with my supervisor as a result of this I felt no support in addressing my concern. I shared my fear of retaliation which he stated, he understood and would be happy to schedule a meeting between myself, Nadine, and Dr. Williams at that point I believed he would not be an advocate for me, so I declined his support with facilitating a meeting.

As a result of this treatment, I have experienced significant emotional, professional, and personal impacts. The distress caused by these incidents has negatively affected my well-being and work performance, ultimately leading to my receiving a written Coaching Action Plan. I believe this behavior contradicts the standards of equality and respect that Montgomery County upholds.

I respectfully request that the county thoroughly investigate this matter and take appropriate action. Steps must be taken to ensure that discrimination of this nature does not occur in the future, both for my well-being and the protection of others who may face similar treatment.

I would appreciate the opportunity to discuss this matter further with you and am available for a meeting or to provide any additional information you may need. Please feel free to contact me at 610-202-3001 or via email at Linda.Moore-Singleton@montgomerycountypa.gov to arrange a time for further discussion.

Thank you for your attention to this serious matter. I look forward to your prompt response.

**Sincerely,**
Linda Moore-Singleton

CC: Stephanie Tipton-Deputy Chief Operating Officer
Donna Richemond- Chief Diversity Equity & Inclusion Officer

# Exhibit C

**Linda Moore-Singleton**
Administrator
Health and Human Services Office of Drug and Alcohol
February 11, 2025

**To:** Francis Bartusis
Human Relations Manager
Human Resources
610-278-3052

**Re: Addendum to Grievance Regarding Retaliation**

Dear Fran,

I am submitting this addendum to my previously filed grievance, dated January 28, 2025, regarding retaliation that I believe has been occurring in my office. Since filing my initial grievance, I have become aware of additional actions by certain staff members that further demonstrate retaliatory behavior and undermine the efforts I've made to maintain a positive working environment.

- On February 4, 2025, I was meeting with a staff member for supervision and was told that after our January staff meeting which occurred on the 27th, she was asked to assist the staff who I believe is retaliating against me due to not securing a position for her in my office once the grant she was hired under funding ends December 31, 2025. This staff made disparaging remarks about wanting to send an email to me and blind copy my supervisor and shared she's been doing this since her one-to-one with my supervisor last month. This was not the first incident that led me to believe this was retaliation, but I brushed it off as staff feeling frustrated by their previous supervisor who resigned in September 2024. During a staff meeting in October 2024 one of her peers became visibly upset stating, that he didn't feel safe being around some of his peers while sharing, I am going to remove the elephant from the middle of the room." immediately states, "Say what you need to say to Lynne's face instead of constantly talking about her behind her back" or "leaving her office making negative remarks." This was verified when another peer decided to share unsolicited information about the anxiety she feels about answering a call from this same peer who seems to call in the evenings sharing negative things about me and further shared, "I didn't like having to answer questions about you during an interview with my supervisor and HR on two separate occasions and shared, "It doesn't feel good whatever this thing is doesn't feel right." Additionally, on February 9, 2025, during a supervision meeting, the staff stated, you have no idea how deep this racial stuff towards you goes! It's deeper much deeper" These comments were made in a manner that suggested my initial concerns with my supervisor's lack of support and alignment with my staff had somehow led to their actions, which has created a hostile work environment.

  Additionally, my supervisor held private meetings with my staff without informing me of the outcome or allowing my input or presence. This exclusion, I believe, is another form of retaliation intended to undermine my role or an opportunity to address any concerns from my team in a manner that will promote growth and allow positive morale and team support. I believe this situation has caused me to feel isolated and undermined in my professional

capacity. I have noticed a decline in my work performance as well as increased stress, lack of support, and limited communication on how to move forward from my supervisor.

I respectfully request that this addendum be considered as part of my ongoing grievance and that an investigation be conducted into the actions of my supervisor and staff. I believe this behavior constitutes retaliation, which should be addressed to maintain a respectful and professional work environment.

I appreciate your attention to this matter and hope it will be addressed swiftly. I remain committed to working in a respectful and professional environment, and I trust that the proper steps will be taken to resolve this issue.

Sincerely,
Linda Moore-Singleton
Linda.Moore-Singleton@montgomerycountypa.gov
HHS/ODA

# Exhibit D

**Subject** Fw: I am sending this as a request to re-open the investigation that was brought against me as an unbiased leader. Lot of information but I am up against racism and conscious biases NO WEAPON FORMED AGAINST ME SHALL PROSPER!

**From** Lynne Moore <lynnemoore47@yahoo.com>

**To:** Renaya Furtick Wheelan PhD <furtickwheelanphd@gmail.com>

**Date** Jun 6, 2025 at 6:13 PM

Please read! Let me know your thoughts.

Begin forwarded message:

On Friday, June 6, 2025, 11:33 AM, Moore-Singleton, Linda <Linda.Moore-Singleton@montgomerycountypa.gov> wrote:

--

**Linda Moore-Singleton**
Administrator, Office of Drug and Alcohol
Department of Health and Human Services
Montgomery County, PA

P: (610) 278-3630

www.montgomerycountypa.gov/hhs

Montgomery County Department of Health and Human Services

This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, forwarding, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

---

**From:** Moore-Singleton, Linda <Linda.Moore-Singleton@montgomerycountypa.gov>
**Date:** Friday, June 6, 2025 at 6:50 AM
**To:** Brew, Anthony <Anthony.Brew@montgomerycountypa.gov>
**Subject:** I am sending this as a request to re-open the investigation that was brought against me as an unbiased leader. Lot of information but I am up against racism and conscious biases NO WEAPON FORMED AGAINST ME SHALL PROSPER!

Good Morning Tony,
**My apologies for this long email.** However, I think it conveys my concerns with all that has been shared and or presented to me by you based on the "Investigation" completed by your staff. This has placed so much stress on me that has now affected my health. I want you to know I value my job and will always take accountability for my actions. I want to thank you for the opportunity to respond to the concerns raised regarding my leadership and conduct and create feedback on what I believe will help me move forward. I want to express my deep concern and disappointment over what I believe are targeted, slanderous, and unfounded allegations made against me—many of which lack any documented, factual basis other than verbal exchanges from a few(emphasized) not all my staff. I take these allegations seriously, not only because they affect my professional reputation, but also because they appear to be the result of ongoing internal targeting and biased reporting. It is obvious that Nadine is pushing for me to be placed on a PIP after I filed a grievance against her and evidently clear that Fran can't be neutral since he was also mentioned in my grievance as a concern when he was clearly siding with Nadine based on his statements and I am just going to come out and say he has lied in his investigation when he said(all of my staff) at the time of his interview I had 6 staff of these six 3 of them want to see me fired due to the color of my skin. I would also like to add that during my follow-up interview with Megan Brown and Tara Katzman I was informed that the only way to prove an allegation is to have tangible information or it's my word against someone else's. I was never afforded the opportunity to provide any documentation during any of the investigations as well Megan asked if I had ever recorded my meetings via Teams or zoom as proof of my allegations written in my grievance as well she stated she only spoke with Tamra and Nadine( who were the alleged offenders of my grievance) I shared that I named staff who were present. Immediately after meeting I reached out to

staff that I named in my grievance and was told no one from HR reached out to them.

I implore you to re-open this investigation and speak with all my staff and peers since my character, leadership, and integrity is being questioned, as an unbiased neutral party. I can share more if you allow me to have a one-to-one conversation.
I took the six areas you've Identified and provided a response as well attached some information that goes against some of the allegations made against me.

---

**1. Performance and Leadership**
The coaching plan was introduced as a development tool, and I was explicitly told by Nadine that it would remain a document between us. Fran directed me to speak with Nadine and Tamra, reinforcing that the coaching plan was to be a supportive measure—not punitive or performance-related. I also have not received a performance evaluation since January 2024 which I have attached that shows my work ethics, documents proof of no performance concerns regarding my leadership.
While there have been statements made that there is "no significant change," I have consistently taken initiative to address team needs, implement improvements, and work within the constraints and culture of the department. Unfortunately, I have not received formal feedback mechanisms or benchmarks by which this progress has been evaluated, leaving these judgments subjective and, in my opinion, unfairly negative.

---

**2. Communication in Supervision**
Regarding supervision meetings, the January 30 session was canceled due to time-sensitive RFPs, and the March monthly meeting was rescheduled due to calendar conflicts. I have continued to communicate with staff via email and informal check-ins, though I acknowledge there may be opportunities for increased consistency.
However, this does not reflect a willful lack of communication or disregard for staff needs. I am committed to improving supervision structure and ensuring meetings are prioritized, but context must be considered when evaluating these claims.

---

**3. Allegations of Passive-Aggressiveness and Unprofessionalism**
The "knife in the back" comment during an icebreaker was made in poor judgment and I regret the phrasing. However, it was not meant to be malicious and was shared in a light-hearted context, not as a personal attack. The statement about staff needing to "get their shit together" was made in a private, confidential conversation out of frustration, and I recognize it could have been communicated differently. I take full responsibility for that wording. Still, to elevate this to a policy violation—when made in private, without any intent to harm—feels disproportionate and dismisses the many professional interactions I've maintained with the team.

---

**4. Comments During Team Building**
To my knowledge, no inappropriate comments were made during team-building sessions. These accusations have not been supported by direct examples or witnesses, and I cannot respond further without specific details. I strive to foster a safe and open environment and am open to receiving clear, documented feedback if a comment was misunderstood.

---

**5. Retaliation and Threat Allegations**
This is the most distressing accusation and one I categorically deny. I have **never** threatened or implied consequences for staff engaging with HR. I was informed by several staff during supervisions on **February 17th and 18th** that they were told interviews with HR were **mandatory**, with **no option to opt out.** This undermines the voluntary and confidential nature these interviews should have and raises questions about how this process was managed.
Further, five out of my seven staff have shared with me their concern that **Renee Pigeon has repeatedly and blatantly targeted me,** presenting me negatively to Fran without evidence, and influencing perceptions unfairly. I am extremely troubled that Fran has accepted these unsubstantiated reports without offering me the opportunity to refute or clarify.

---

**6. Delegation of Duties**
Role clarity has evolved over time in response to changing departmental needs. While I acknowledge there may have been some confusion, I have actively communicated adjustments and provided clarification whenever requested. Training resources have been a persistent challenge, which I have escalated without clear resolution.

---

**Additional Concerns**

- During a **recent team check-in,** my deputy informed me that a staff member expressed discomfort over my presence in a recent staff meeting, even though Nadine and Laura were there specifically to support the meeting and gain feedback on how they believe HHS could move forward in the work we have started as well to gather insight into

what they need to do their jobs. The same staff member reportedly contacted another team member shortly afterward to complain about my presence and inquired whether to share her discomfort with Fran.

- This behavior indicates a **pattern of fixation and ongoing efforts to discredit me.** I'm concerned that this individual has not reflected on her own role in these dynamics. Despite applying for **six internal positions** and not receiving offers or interviews, this is now being displaced as resentment toward my leadership.
- I have communicated these concerns to both Nadine and Fran without a clear resolution or support, leaving me feeling vulnerable and unsupported in what is clearly a hostile environment being enabled through inaction. I have attached a few items that I hope will give a snapshot of what I have been doing to improve my leadership and move my team forward.

---

**Tony's Broader Reflections**

I recognize the importance of:

- Developing working trust
- Promoting a healthy work environment
- Building emotional intelligence and relationship management
- Creating psychological safety and inclusive leadership

However, achieving these goals is impossible without mutual accountability. When one or more staff can continuously make unsubstantiated claims and weaponize HR processes against a supervisor without evidence, it creates a toxic feedback loop. I am deeply committed to professional growth and collaboration, but **that must go hand-in-hand with fairness and due process.**

While I hear your message that we must "move forward," and I agree that improvement and support are important, I cannot do so effectively while being subjected to ongoing attacks, biased narratives, and lack of leadership accountability. I was supervised by Tamra for 2 years and Nadine 11 months. I have been an employee in this county for 4 years and worked in this field for 35 years.

---

**My Request Going Forward**

- A **formal inquiry** into staff claims that HR interviews were presented as mandatory without the option to opt out.
- A **review of communication** and reporting patterns between Renee Pigeon and Fran to determine whether ethical HR boundaries were crossed.
- Clear **documentation standards** for any future allegations or concerns raised against me.
- A direct conversation around **training, role clarity**, and leadership expectations that includes Nadine, Fran, and yourself to ensure alignment and support.
- Hold off on giving a **Performance Improvement Plan** until the above request has been satisfied.
- Incorporate **diversity, and cultural competency trainings** for myself and staff. I believe it goes without saying that there are racial concerns with-in my office and HHS. Considering prior to the most recent hire of the Fiscal Administrator I was the only Black Administrator hired in the history of HHS.

I remain fully open to constructive dialogue, contracted trainings, and any resources provided through the county's formal plan. My goal remains to support my staff and build a healthy, productive workplace. But I must also advocate for my right to a workplace free from defamation, bias, and unfair treatment.

Sincerely,
Lynne

--

11 Attachments

RE_ Response to Coaching_Actio...

Reminder to send all supervision n...

Supervision form .eml

Response to concerns presented ...

ODA Staff meeting .eml

View all attachments

# Exhibit E

**Subject** Fw: I am sending this as a request to re-open the investigation that was brought against me as an unbiased leader. Lot of information but I am up against racism and conscious biases NO WEAPON FORMED AGAINST ME SHALL PROSPER!

**From** Lynne Moore <lynnemoore47@yahoo.com>

**To:** Nicole Dandy <ndandy4040@gmail.com>

**Date** Jun 6, 2025 at 5:19 PM

Sent from Yahoo Mail for iPhone

Begin forwarded message:

On Friday, June 6, 2025, 5:13 PM, Moore-Singleton, Linda <Linda.Moore-Singleton@montgomerycountypa.gov> wrote:

Get Outlook for iOS

**Linda Moore-Singleton**
Administrator, Office of Drug and Alcohol
Department of Health and Human Services
Montgomery County, PA

P: (610) 278-3630

www.montgomerycountypa.gov/hhs

Montgomery County Department of Health and Human Services

This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, forwarding, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

---

**From:** Brew, Anthony <Anthony.Brew@montgomerycountypa.gov>
**Sent:** Friday, June 6, 2025 5:03:27 PM
**To:** Moore-Singleton, Linda <Linda.Moore-Singleton@montgomerycountypa.gov>
**Subject:** Re: I am sending this as a request to re-open the investigation that was brought against me as an unbiased leader. Lot of information but I am up against racism and conscious biases NO WEAPON FORMED AGAINST ME SHALL PROSPER!

Good Afternoon Lynne,

I received your e-mail. As I communicated to you in our meeting, now is the time to look forward, not backward. I have reviewed the investigations that were conducted, and I am satisfied that they were completed in an objective manner. I do not see what good would be served by re-opening those investigations, as you requested.

You have stated that you believe three of your staff want to see you fired because of the color of your skin. Other than your personal belief, do you have any evidence to support this very serious allegation? If so, please provide it to me.

Beyond those items, I will not respond to the many things contained in your e-mail. To do so would be looking backwards, and as I said many times, now is the time to look forward. You requested that we delay the implementation of the PIP. That is not going to be delayed. Instead, I think that is an important step in looking forward. It will also provide you with consistent feedback, which you have stated you would like. I think if you embrace the spirit of the PIP, and truly work on your performance, this can be the start of a new day.

Finally, in your e-mail you stated that your job has created stress that has affected your health. If you believe that you require any kind of workplace accommodations as a result of this, please contact Camille Stevenson in HR, who handles all ADA requests.

Thanks,
Tony

**Anthony Brew**
Chief Human Resource Officer
Human Resources

610-278-3054
Ext. 3054

**Anthony Brew**
Chief Human Resources Officer
Human Resources

P: (610) 278-3054
X: 3054

This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, forwarding, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

---

**From:** Moore-Singleton, Linda <Linda.Moore-Singleton@montgomerycountypa.gov>
**Sent:** Friday, June 6, 2025 6:50 AM
**To:** Brew, Anthony <Anthony.Brew@montgomerycountypa.gov>
**Subject:** I am sending this as a request to re-open the investigation that was brought against me as an unbiased leader. Lot of information but I am up against racism and conscious biases NO WEAPON FORMED AGAINST ME SHALL PROSPER!

Good Morning Tony,
**My apologies for this long email.** However, I think it conveys my concerns with all that has been shared and or presented to me by you based on the "Investigation" completed by your staff. This has placed so much stress on me that has now affected my health. I want you to know I value my job and will always take accountability for my actions. I want to thank you for the opportunity to respond to the concerns raised regarding my leadership and conduct and create feedback on what I believe will help me move forward. I want to express my deep concern and disappointment over what I believe are targeted, slanderous, and unfounded allegations made against me—many of which lack any documented, factual basis other than verbal exchanges from a few(emphasized) not all my staff. I take these allegations seriously, not only because they affect my professional reputation, but also because they appear to be the result of ongoing internal targeting and biased reporting. It is obvious that Nadine is pushing for me to be placed on a PIP after I filed a grievance against her and evidently clear that Fran can't be neutral since he was also mentioned in my grievance as a concern when he was clearly siding with Nadine based on his statements and I am just going to come out and say he has lied in his investigation when he said(all of my staff) at the time of his interview I had 6 staff of these six 3 of them want to see me fired due to the color of my skin. I would also like to add that during my follow-up interview with Megan Brown and Tara Katzman I was informed that the only way to prove an allegation is to have tangible information or it's my word against someone else's. I was never afforded the opportunity to provide any documentation during any of the investigations as well Megan asked if I had ever recorded my meetings via Teams or zoom as proof of my allegations written in my grievance as well she stated she only spoke with Tamra and Nadine( who were the alleged offenders of my grievance) I shared that I named staff who were present. Immediately after meeting I reached out to staff that I named in my grievance and was told no one from HR reached out to them.

I implore you to re-open this investigation and speak with all my staff and peers since my character, leadership, and integrity is being questioned, as an unbiased neutral party. I can share more if you allow me to have a one-to-one conversation.
I took the six areas you've Identified and provided a response as well attached some information that goes against some of the allegations made against me.

---

**1. Performance and Leadership**
The coaching plan was introduced as a development tool, and I was explicitly told by Nadine that it would remain a document between us. Fran directed me to speak with Nadine and Tamra, reinforcing that the coaching plan was to be a supportive measure—not punitive or performance-related. I also have not received a performance evaluation since January 2024 which I have attached that shows my work ethics, documents proof of no performance concerns regarding my leadership.
While there have been statements made that there is "no significant change," I have consistently taken initiative to address team needs, implement improvements, and work within the constraints and culture of the department.

Unfortunately, I have not received formal feedback mechanisms or benchmarks by which this progress has been evaluated, leaving these judgments subjective and, in my opinion, unfairly negative.

---

**2. Communication in Supervision**

Regarding supervision meetings, the January 30 session was canceled due to *time-sensitive RFPs*, and the March *monthly meeting was rescheduled due* to calendar conflicts. I have continued to communicate with staff via email and informal check-ins, though I acknowledge there may be opportunities for increased consistency.

However, this does not reflect a willful lack of communication or disregard for staff needs. I am committed to improving supervision structure and ensuring meetings are prioritized, but context must be considered when evaluating these claims.

---

**3. Allegations of Passive-Aggressiveness and Unprofessionalism**

The "knife in the back" comment during an icebreaker was made in poor judgment and I regret the phrasing. However, it was not meant to be malicious and was shared in a light-hearted context, not as a personal attack. The statement about staff needing to "get their shit together" was made in a private, confidential conversation out of frustration, and I recognize it could have been communicated differently. I take full responsibility for that wording. Still, to elevate this to a policy violation—when made in private, without any intent to harm—feels disproportionate and dismisses the many professional interactions I've maintained with the team.

---

**4. Comments During Team Building**

To my knowledge, no inappropriate comments were made during team-building sessions. These accusations have not been supported by direct examples or witnesses, and I cannot respond further without specific details. I strive to foster a safe and open environment and am open to receiving clear, documented feedback if a comment was misunderstood.

---

**5. Retaliation and Threat Allegations**

This is the most distressing accusation and one I categorically deny. I have **never** threatened or implied consequences for staff engaging with HR. I was informed by several staff during supervisions on **February 17th and 18th** that they were told interviews with HR were **mandatory**, with **no option to opt out**. This undermines the voluntary and confidential nature these interviews should have and raises questions about how this process was managed.

Further, five out of my seven staff have shared with me their concern that **Renee Pigeon has repeatedly and blatantly targeted me**, presenting me negatively to Fran without evidence, and influencing perceptions unfairly. I am extremely troubled that Fran has accepted these unsubstantiated reports without offering me the opportunity to refute or clarify.

---

**6. Delegation of Duties**

Role clarity has evolved over time in response to changing departmental needs. While I acknowledge there may have been some confusion, I have actively communicated adjustments and provided clarification whenever requested. Training resources have been a persistent challenge, which I have escalated without clear resolution.

---

**Additional Concerns**

- During a **recent team check-in**, my deputy informed me that a staff member expressed discomfort over my presence in a recent staff meeting, even though Nadine and Laura were there specifically to support the meeting and gain feedback on how they believe HHS could move forward in the work we have started as well to gather insight into what they need to do their jobs. The same staff member reportedly contacted another team member shortly afterward to complain about my presence and inquired whether to share her discomfort with Fran.
- This behavior indicates a **pattern of fixation and ongoing efforts to discredit me.** I'm concerned that this individual has not reflected on her own role in these dynamics. Despite applying for **six internal positions** and not receiving offers or interviews, this is now being displaced as resentment toward my leadership.
- I have communicated these concerns to both Nadine and Fran without a clear resolution or support, leaving me feeling vulnerable and unsupported in what is clearly a hostile environment being enabled through inaction. I have attached a few items that I hope will give a snapshot of what I have been doing to improve my leadership and move my team forward.

---

**Tony's Broader Reflections**

I recognize the importance of:

- Developing working trust
- Promoting a healthy work environment
- Building emotional intelligence and relationship management
- Creating psychological safety and inclusive leadership

- Creating psychological safety and inclusive leadership

However, achieving these goals is impossible without mutual accountability. When one or more staff can continuously make unsubstantiated claims and weaponize HR processes against a supervisor without evidence, it creates a toxic feedback loop. I am deeply committed to professional growth and collaboration, but **that must go hand-in-hand with fairness and due process**.

While I hear your message that we must "move forward," and I agree that improvement and support are important, I cannot do so effectively while being subjected to ongoing attacks, biased narratives, and lack of leadership accountability. I was supervised by Tamra for 2 years and Nadine 11 months. I have been an employee in this county for 4 years and worked in this field for 35 years.

---

**My Request Going Forward**

- A **formal inquiry** into staff claims that HR interviews were presented as mandatory without the option to opt out.
- A **review of communication** and reporting patterns between Renee Pigeon and Fran to determine whether ethical HR boundaries were crossed.
- Clear **documentation standards** for any future allegations or concerns raised against me.
- A direct conversation around **training, role clarity**, and leadership expectations that includes Nadine, Fran, and yourself to ensure alignment and support.
- Hold off on giving a **Performance Improvement Plan** until the above request has been satisfied.
- Incorporate **diversity, and cultural competency trainings** for myself and staff. I believe it goes without saying that there are racial concerns with-in my office and HHS. Considering prior to the most recent hire of the Fiscal Administrator I was the only Black Administrator hired in the history of HHS.

I remain fully open to constructive dialogue, contracted trainings, and any resources provided through the county's formal plan. My goal remains to support my staff and build a healthy, productive workplace. But I must also advocate for my right to a workplace free from defamation, bias, and unfair treatment.

Sincerely,
Lynne

--

**Linda Moore-Singleton**
Administrator, Office of Drug and Alcohol
Department of Health and Human Services

P: (610) 278-3630

This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, forwarding, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

Hide trimmed content

# Exhibit F

**Performance Improvement Plan**

**Employee:** Linda Moore-Singleton
**Position:** Administrator
**Department:** Office of Drug and Alcohol
**Manager:** Nadine Miller, HHS Interim Director
**Duration of the plan:** 90 days

On October 29, 2024, Ms. Moore-Singleton was placed on a Coaching Plan by former Deputy Chief Operating Officer / HHS Director Tamra Williams. The purpose of the Coaching Plan was to assist Ms. Moore-Singleton in improving her performance as the Office of Drug and Alcohol Administrator. Unfortunately, the Coaching Plan was insufficiently implemented with little to no follow-up and the performance issues continue to persist.

On June 2, 2025, Ms. Moore-Singleton met with Tony Brew, Chief Human Resource Officer, and Nadine Miller, Interim Director of Health and Human Services. The purpose was to review findings from Human Resources investigation and initiate an employee performance improvement plan.

Ms. Moore-Singleton must focus more on the role and responsibility of leading her office. As the administrator, Ms. Moore-Singleton is responsible for the overall performance and culture of her team. Her team needs leadership that builds trust, creates a respectful and supportive environment, and demonstrates effective decision-making.

Immediate and sustained improvement in Ms. Moore-Singleton's performance is imperative. The Performance Improvement Plan (PIP) outlined below is intended to clarify these expectations. Ms. Moore-Singleton is required to promptly demonstrate the specified performance expectations.

To facilitate continuous improvement, bi-weekly formal performance reviews will be conducted, in person, with Interim HHS Director Nadine Miller and Deputy HHS Director Laura York. In addition, written summaries of Ms. Moore-Singleton's progress will be documented for the next 90 days. This plan is subject to modification based on Ms. Moore-Singleton's progress during this period.

**Overview:**
This Performance Improvement Plan (PIP) is designed for Ms. Moore-Singleton to address performance concerns and meet expectations.

- Area(s) of Concern:
  A. Ms. Moore-Singleton must develop an open and trusting work environment to ensure optional employee productivity. The current work environment is currently described as toxic, stressful, and chaotic. While Ms. Moore-Singleton has expressed concern for the employees' contribution to the current work environment, it is her responsibility to ensure that employees can effectively carry out job responsibilities. Ms. Moore-Singleton will:

1. Respond timely to staff's emails and requests.
2. Provide clear directions/guidance to staff to complete timely tasks.
3. Maintain professional communication with staff.
4. Develop conflict resolution skills.
5. Complete NEOGOV Training – Excelling as a Manager or Supervisor (Parts 1–9)
6. Provide Interim HHS Director Nadine Miller with a bi-weekly summary of office progress and work being completed.

B. Ms. Moore-Singleton lacks effective team management skills. Employees are often left with unclear directions and receive inconsistent information. Clear and concise communication effectively conveys information, instructions, and feedback to employees. Active listening provides the opportunity to understand and respond to employee concerns and receive input. Ms. Moore-Singleton will:
   1. Schedule weekly, in-person, supervision meetings with direct reports.
   2. Provide supervision meeting notes for each direct report's meeting.
   3. Provide consistent supervision, cancelled supervision are to be rescheduled.
   4. Refrain from discussing or asking employees about other employees.
   5. Provide guidance and directions to support direct reports task completion.
   6. Participate in teambuilding check-in meetings with Nancy Walsh and Nadine Miller. At least two individual meetings and one full staff meeting.
   7. Hold monthly in-person staff meetings to cultivate a healthy team environment. These meetings should include an agenda, sign in sheet, and meeting notes. The staff meeting invite will be sent to Nadine Miller and Laura York. *LMS - Actively participate in all monthly staff meetings facilitated by my leadership team.*

C. An essential part of Ms. Moore-Singleton role and responsibility is to lead the office in a competent manner. Exhibiting and demonstrating desired behaviors from all employees begins with the organization's leader, which is currently lacking within the Office of Drug and Alcohol. To address these deficiencies, Ms. Moore-Singleton will:
   1. Work two full days (8am- 4:30pm) in-office per week.
   2. Attend in-person bi-weekly performance reviews as scheduled by Nadine Miller and Laura York.
   3. Lead with support and a strength-based approach. *LMS - Continue to foster a positive and supportive atmosphere for my staff.*
   4. Follow-through with recommendations from Nancy Walsh's facilitated staff teambuilding retreats. *LMS - Implement at least one morale-building or staff recognition initiative per month to strengthen team cohesion and engagement.*
   5. Clearly outline staff members roles and responsibilities
   6. Hold bi-weekly, in-person, ODA team meetings to review progress on assigned projects, plans, and timeframes. These meetings should include an agenda, a sign-in sheet, and meeting notes that are distributed to all team members.
   7. Monitor individual team members assigned work to ensure timely completion
   8. Lead and model positive behavior

Share Folder c Nadine

9. Participate in activities that strength teamwork

D. Accountability involves taking responsibility for actions, results, and decisions. Improvement is needed in Ms. Moore-Singleton's approach to self-accountability and to hold employees accountable. Modeling desired behavior sets an expectation and example for employees to follow. Ms. Moore-Singleton will:
   1. Record accurate work activities on work calendar.
   2. Record single work activities on calendar (e.g., Calendar should not state personal day and multiple work meetings on that day).
   3. Suspend attendance at day long meetings.
   4. Suspend attendance at multi-day conferences, unless pre-approved by Nadine Miller.
   5. Update time off requests as needed to reflect time taken.
   6. Use personal time to conduct/facilitate non-county training.
   7. *LMS - Remain open to quarterly documented feedback sessions from leadership, using the input to guide professional development and performance refinement.*

**Resources:**

a. HHS Interim Director Nadine Miller and Deputy Director of HHS Laura York will be available to listen to concerns, answer questions, and provide support.
b. Nancy Walsh (Team Building / Leadership Development)
c. NEOGOV training – Excelling as a Manager or Supervisor (Parts 1-9)

**Goal(s):**

1. Improved team collaboration and cohesion led by effective leadership and clear communication.
2. Improved oversight of direct reports through regular supervision to ensure completion of required tasks.
3. Effective demonstration of improved ODA operations to meet all County and State requirements.

**Progress Check-Ins:** *Provide a written description of when check-ins will be conducted, who will be present, how check-ins will be conducted and what expectations must be met by that check-in meeting.*

| Date | Where/How | Who | Notes on Expectations to be Met |
| --- | --- | --- | --- |
| Bi-Weekly Meetings beginning June 16, 2025 and ending September 15, 2025. | A bi-weekly, in-person meeting will be held to discuss and review the above-mentioned areas of concern and progress made to correct the concerns. | Employee<br><br>Nadine Miller<br><br>Laura York | • Review of sign-in sheets, agendas, and meeting minutes from bi-weekly team meetings.<br>• Review of supervision meeting notes for each team member.<br>• Review of calendar for accuracy related to time-off, meetings, etc.<br>• Review of adherence to two in-office days per week.<br>• Review of progress made implementing Nancy Walsh's team building recommendations.<br>• Review of the bi-weekly summary of ODA office progress and work completed.<br>• Review of progress made to complete NEOGOV training "Excelling as a Manager or Supervisor (Parts 1-9)" |

Ms. Moore-Singleton should not hesitate to speak to her supervisor if she believes there is a barrier to improving her performance. Ms. Moore-Singleton will continue to receive support to ensure she can be successful in her position.

## Acknowledgement

I, Linda Moore-Singleton, acknowledge and understand the necessary steps I must take to enhance my performance and consistently meet the specified expectations. I am committed to working collaboratively with my supervisor to improve in the identified areas. I recognize that not achieving the stated goals or working towards the stated goals may lead to further action, including termination of employment, if performance does not improve.

Signed Copy on file with HR

6/9/25

| Employee Name (Printed) | Employee Signature | Date |
| --- | --- | --- |
| Supervisor Name (Printed) | Supervisor Signature | Date |

# Exhibit G

SEPARATION AGREEMENT, GENERAL RELEASE AND WAIVER OF CLAIMS

This Separation Agreement, General Release and Waiver of Claims ("Agreement") is made between the County of Montgomery ("County") and Linda Moore-Singleton ("Employee").

WHEREAS, the County has made the decision to terminate of Employee's employment with the County; and

WHEREAS, Employee and County desire to resolve all potential issues arising out of Employee's employment with the County in exchange for a severance payment; and

NOW THEREFORE, in consideration of the mutual promises and other good and valuable consideration set forth herein, the parties agree and intend to be legally bound as follows:

## I. COUNTY'S PROMISES

A. In return for Employee's promises set forth herein, County will Employee a severance benefit in the sum of Twenty Six Thousand, Two Hundred, Forty Eight Dollars and Sixty-Four Cents ($26,248.64), less required deductions in a lump sum payment. This $26,248.64 payment is the equivalent of three (3) months of pay at Employee's current salary of $104,994.54 Such payment will be made in a lump sum on the first regular County payroll date following the expiration of the revocation period set forth in Section IV (D) of this Agreement.

B. Also in return for the Employee's promises set forth herein, the County will provide health insurance to Employee through October 31, 2025. This will be done by the County paying the COBRA premiums on Employee's behalf through October 31, 2025. It will be Employee's obligation to complete all necessary COBRA enrollment forms.

C. Employee's separation with the County is effective July 16, 2025.

D. County agrees to not challenge or otherwise appeal any Pennsylvania Unemployment Compensation Benefits that may be awarded to Employee should she file for Unemployment Compensation Benefits.

E. Except as provided for enforcement of any breach by Employee of the terms of this Agreement, the County promises not to file, pursue and/or prosecute any litigation or claims against Employee arising, in whole or in part, from any event which occurred prior to and as of the date of this Agreement.

F. The County agrees that should it receive a reference request regarding Employee, that it will only provide verification that the employee worked for the County, her dates of employment and position held.

## II. EMPLOYEE'S PROMISES

A. Employee agrees that she is not aware of any outstanding charges, claims or lawsuits against the County that have been filed by Employee or on Employee's behalf.

B. Employee acknowledges that while employed by the County, she had access to, possessed or was otherwise exposed to confidential information in connection with her employment and that the employee was at all times under a duty to maintain the confidentiality of such information and not to use the same for her benefit or the benefit of another party. The Employee understands, acknowledges, and agrees that the duties, obligations and covenant to maintain the confidentiality of information concerning the County and its affiliates and subsidiaries continue indefinitely and do not terminate with the termination of her employment with the County.

C. Employee irrevocably and unconditionally releases and discharges the County ("Releasee") from all legal, equitable, or administrative claims, known and unknown, that she may have against the County arising on or before the effective date of this Agreement. Employee agrees that this includes any legal, equitable and administrative claims ("Claims") arising from her employment with, or severance from, the County, with the exception of a dispute arising out of the performance or enforcement of this Agreement. This release specifically includes, but is not limited to, any claims arising under the Family and Medical Leave Act, the National Labor Relations Act, the Railway Labor Act, the Employee Retirement Income Security Act, the Equal Pay Act, the Occupational Safety and Health Act, the Worker Adjustment Retraining Notification Act, the Pennsylvania Whistleblower Law, Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, the Americans With Disabilities Act Amendment Act, Section 1981 of the Civil Rights Act of 1866, the Civil Rights Act of 1991, the Age Discrimination in Employment Act, the Older Workers Benefit Protection Act, the Rehabilitation Act of 1973, Executive Order 11246 and any other executive order, the Fair Labor Standards Act and its state and local counterparts, the Vietnam-ERA Veterans Readjustment Assistance Act of 1974, the Uniform Services Employment and Reemployment Rights Act, the Immigration Reform Control Act, the Pennsylvania Human Relations Act, the Pennsylvania Wage Payment and Collection Law, the Pennsylvania Equal Pay Law, all as amended, and all other claims arising under federal, state, or local statutes, common law, or arising under any contracts of any kind through the effective date of this Agreement. This release also includes a release of any claim for tortious conduct, wrongful discharge or for attorney's fees or costs of any kind including all litigation costs and court costs. This Agreement shall not be construed as a waiver of any vested rights that Employee has or may have in any pension, or other vested qualified retirement plan benefits.

1) Employee agrees not to file, pursue, participate in, induce, aid or abet any lawsuit, claim or a cause of action against the County based on any event which took place prior to the effective date of this Agreement; and

2) Employee agrees to release and discharge the County not only from any

and all claims which Employee could make on her own behalf, but Employee also specifically waives any right to become, and promises not to become, a member of any class in any proceeding or case in which a claim or claims against the County may arise, in whole or in part, from any event which occurred as of the effective date of this Agreement. The parties agree that if Employee, by no action of his own, becomes a mandatory member of any class from which Employee cannot, by operation of law or order of court, opt out, such mandatory class membership will not constitute a breach of this Agreement.

3) Nothing in this Agreement should be construed to prevent Employee from filing a Charge with the EEOC, although Employee specifically waives any right to any monetary or other recovery in such a charge.

D. Employee agrees that she will not disclose the facts, terms or amounts recited in this Agreement to anyone other than a member of the Employee's immediate family or a professional representative of the Employee, and even as to such person, only if the person is informed of and agrees to honor this confidentiality requirement. This subsection shall not prohibit disclosure of this Agreement to the extent necessary to enforce this Agreement or to the extent otherwise legally required.

E. Employee agrees to return to the County all County property in her possession or control, if any, including but not limited to identification cards, keys, credit cards, equipment, files, memoranda, documents, records, and any copies thereof.

F. Employee hereby agrees that she will not at any time make, publish, or communicate, verbally, in writing or electronically to any person or entity or in any public forum, any defamatory or disparaging remarks, comments, or statements concerning the County or its businesses, or any of its employees, officers, and existing and prospective customers, suppliers, vendors and other associated third parties. This Section 9 does not, in any way, restrict or impede the Employee from exercising protected rights to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order.

## III. MISCELLANEOUS TERMS AGREED TO BY THE PARTIES

In exchange for the promises made by and to Employee and the County, they mutually agree to the following terms:

A. This Agreement, and performance under its terms, shall be governed in all respects by the law of the Commonwealth of Pennsylvania unless otherwise controlled by federal law.

B. By entering into this Agreement, the County does not admit to violating any

state, federal, or local laws, or to any wrongful conduct of any kind. The County expressly denies any wrongdoing or violation of any law. This Agreement shall not be admissible as evidence of an admission of liability, wrongdoing or a violation of any law, in any proceeding under any federal, state or local law.

C. This Agreement contains the entire and only agreement between the County and Employee. Both parties waive any oral or written promises or assurances which are not contained in this Agreement.

D. Without limiting any of the County's other remedies, if a court finds that Employee has breached the provisions of Sections I and II, the court may award liquidated damages, up to $2,500 per violation, to remedy the breach, as the court deems appropriate, as well as order Employee to pay for the County's reasonable attorney's fees in enforcing the Agreement against the breach.

E. Employee and the County agree that this Agreement shall not become effective unless and until the seven (7) day revocation period set forth in Section IV. has been satisfied.

F. Should any provision of this Agreement, other than the payment or release of claims provisions contained herein, be declared or be determined by any court to be illegal or invalid, the validity of the remaining parts, terms or provisions shall not be affected thereby, and said illegal or invalid part, term or provision shall be deemed not to be a part of this Agreement.

G. The Parties specifically agree that any action to enforce this Agreement shall be brought solely in the Court of Common Pleas of Montgomery County, Pennsylvania.

## IV. EMPLOYEE'S ACKNOWLEDGMENTS AND ASSURANCES TO COUNTY

**THIS AGREEMENT IS A LEGAL DOCUMENT WITH LEGAL CONSEQUENCES. THE COUNTY WANTS TO BE CERTAIN THAT EMPLOYEE FULLY UNDERSTANDS THE LEGAL EFFECT OF SIGNING THIS AGREEMENT. EMPLOYEE, THEREFORE, MAKES THE FOLLOWING ASSURANCES TO THE COUNTY:**

**A. EMPLOYEE HAS READ THIS AGREEMENT AND UNDERSTANDS ALL OF ITS PROVISIONS.**

**B. EMPLOYEE VOLUNTARILY ENTERS INTO THIS AGREEMENT, WHICH IS CONTRACTUAL IN NATURE AND CONTAINS A RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS.**

**C. AS REQUIRED BY THE OLDER WORKER'S PROTECTION ACT, EMPLOYEE ACKNOWLEDGES THAT SHE IS ENTITLED TO TWENTY-ONE (21) DAYS WITHIN WHICH TO CONSIDER THIS GENERAL RELEASE AND**

THAT SHE MAY CONSULT WITH AN ATTORNEY OF HER CHOOSING BEFORE EXECUTING IT. SHOULD EMPLOYEE EXECUTE THIS AGREEMENT PRIOR TO THE EXPIRATION OF THE 21-DAY REVIEW PERIOD, EMPLOYEE AGREES THAT SHE IS KNOWINGLY AND VOLUNTARILY WAIVING THIS RIGHT TO CONSIDER THE GENERAL RELEASE FOR THE FULL TWENTY-ONE DAYS. EMPLOYEE ACKNOWLEDGES THAT SHE HAS CAREFULLY READ AND UNDERSTANDS ALL OF THE PROVISIONS OF THIS GENERAL RELEASE AND THAT SHE ENTERS INTO THIS GENERAL RELEASE KNOWINGLY AND VOLUNTARILY.

D. THIS AGREEMENT SHALL NOT BECOME EFFECTIVE UNTIL AFTER SEVEN (7) DAYS FOLLOWING THE DATE OF EMPLOYEE'S SIGNATURE ON THE AGREEMENT. PRIOR TO THAT TIME, EMPLOYEE MAY ELECT TO REVOKE THIS AGREEMENT. IF EMPLOYEE CHOOSES TO REVOKE THIS AGREEMENT, EMPLOYEE SHALL NOTIFY JEFFREY STEWART, ASSISTANT SOLICITOR, IN WRITING, ON OR BEFORE 5 P.M. ON THE SEVENTH DAY.

E. EMPLOYEE HAS THE CAPACITY TO EXECUTE THIS AGREEMENT AND BE BOUND BY IT.

PLEASE READ THIS AGREEMENT CAREFULLY. IT CONTAINS A RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS.

______________________________ ______________
LINDA MOORE-SINGLETON DATE

______________________________
ANTHONRY BREW
Chief Human Resources Officer
County of Montgomery